Will the attorneys who are going to argue the case please approach the podium, identify yourselves and the party you represent, and indicate to the court how much time you want to argue your position. Good afternoon, Your Honor. John Keating on behalf of the Appellant Plaintiff, Paul Berger, Your Honor, if I could reserve five minutes for rebuttal. How much for your argument? How much time would you like to argue? Your Honor, I think, I know you normally allow 20 minutes, I think 20 minutes may be sufficient so long as I can have five minutes, ten minutes for rebuttal. Good afternoon, Joni Jacobson on behalf of the Swisher Defendants and Ecolab's counsel and I will be splitting our time so we'll have ten minutes. Matthew Kipp on behalf of Ecolab, Inc. Ten minutes please. May it please the court, Jon Keating on behalf of the Appellant, Paul Berger. There are a number of issues on the court's plate. Some of them have been decided by the circuit court, some of them haven't. Let me start with the issues that were decided by the circuit court. Let me start with the jurisdiction issue. The issue regarding whether or not there was personal jurisdiction over the individual defendants, the Swisher Directors. The Illinois Directors in this case, namely 2-209A2 which provides for personal jurisdiction over the commission of a tort within Illinois and 209A11 which provides for personal jurisdiction over those committing a breach of fiduciary duty in Illinois. This was decided based on the first complaint, correct? Correct. Decided by Judge Kennedy. But then the allegations were not contained in the second complaint, is that correct? The allegations regarding jurisdiction and the personal defendants. Well, I think they were. The underlying, there was a, the second complaint pleads, had to plead an underlying breach of fiduciary duty in order to state a claim for aiding and abetting. The second complaint dealt with two counts, aiding and abetting a breach of fiduciary duty and the fraudulent transfer. In your first complaint you allege that the various directors breached their fiduciary duty and that was a claim against them in the first complaint, correct? Correct. Was there that claim in the second complaint? The factual, the claim was not. The factual allegations were. So if the claim is not in the second complaint, how does this court have jurisdiction to consider it if it's not contained in the complaint that was dismissed the second complaint? Well, Your Honor, we did not have leave to re-plead. It was dismissed, the allegations were dismissed with prejudice. Right. And we have appealed that order. We appealed that order separately, but. Are you aware of the principle that if a count or counts are dismissed with prejudice and there is a re-plead, a re-pleading of the complaint, that in order to preserve those dismissed counts for appellate review, you need to re-plead them in the second complaint or the amended complaint in order to preserve those dismissed counts for appellate preservation? Your Honor, we made an attempt to preserve it. We did not re-plead the cause of action. The factual allegations are certainly contained. No question. It's basically the same as general conduct. Right. But you don't allege cause of actions against the individual record. Your Honor, I would say that there's certainly been, no one has raised that argument. No one has raised that argument on appeal. It's true. Okay, why don't you go to your next question. Your Honor, sorry, Your Honor, I mean, putting that issue aside, the Roll Honor statute confers jurisdiction, literally, under the Illinois Supreme Court decisions of gray and green, which provide that the last act is the act that determines where the tort occurs. And in this case, the last act, the consummation of the sale, occurred in Illinois. And without the consummation of the sale, there were no damages and the last act, the act that completed the tort, occurred in Illinois. And the last act, the act that completed the tort, occurred in Illinois. And based on that, the long-arm statute, under gray and green, provides for, literally provides for, long-arm jurisdiction. The defendants, the answer for that is, well, the defendants did not attend the closing. But that's a non-separative. They don't have to attend the closing. In gray, none of the defendants were in Illinois. But the last act, the act that completed the tort, occurred in Illinois. And the Illinois Supreme Court held that that was sufficient for purposes of conferring long-arm jurisdiction over that defendant. The other argument they make, that the closing occurred after the complaint. The closing, or the consummation of the sale, occurred after the filing of the complaint. And so, therefore, that contact is somehow insufficient to confer long-arm jurisdiction. And the appellate court has explicitly rejected that argument. And the case is Victron versus program data. And so, so we, we submit that that is not a valid argument either. So the long-arm statute, A2 and A11, provide for jurisdiction. We believe that due process is satisfied. Here, all due process requires is purposeful contact within the jurisdiction. And here they clearly did that. They chose to consummate a $40 million transaction in Illinois. They, you know, they claim there are no contacts here, but they clearly chose to close that transaction here. That was purposeful. That was specified in the agreement. They all approved the agreement. They didn't, they chose, they didn't choose to close in Delaware. They didn't choose to close in North Carolina. They didn't choose to close in Minnesota. They chose Illinois. That's a purposeful contact. There's nothing unfair about requiring directors to defend in Illinois the state in which they, they chose to close a $40 million transaction. The other argument they make is the fiduciary shield argument. And... Let's focus on your second amendment. Yes, Your Honor. You're going to run out of time, and I want to... Thank you, Your Honor. So, so the aiding and abetting claim that Judge Morrison determined, so there are three elements to aiding and abetting. You have to allege, allege, that's all we're talking about here, allege, an underlying breach, known participation by the aider and abetter, and damages. Judge Morrison found that the complaint sufficiently plugged facts that establish or allege an underlying breach of fiduciary duty. Didn't Judge Morrison's order suggest that there was a fourth prong as well, and that is the existence of a fiduciary duty, a relationship? Well, I mean, she held the ruling complaint alleges enough facts to support the claim that the directors breached their fiduciary duties to shareholders by protecting their own self-interest instead of maximizing Swisher's sale price. No, we're talking about the aiding and abetting claim right now. Right, right, so what she does is... It didn't sufficiently allege knowing participation by Echolab. And the second element of the aiding and abetting claim. But look at what the facts are that are alleged. I mean, the complaint alleges that $88 million worth of assets were sold for $40 million. That's number one. Number two, the agreement also contains... I'm sorry, I'm just not hearing that. You just said there was an $80 million company sold for $40 million. That's what you just said. Right, right. In your brief you said it was a $93 million company sold for $40 million. Never mind, move on. I'm sorry. So that's an egregious term by itself that we submit. Highly unusual, suspicious. And we believe there's a motive for that. And we've alleged a motive for that. But in addition to that, the agreement contained other provisions. No solicitation. So here you're getting this fire sale, worse than fire sale, sale. And then there's other provisions to prevent other bidders from coming in and topping that offer. And these were all demanded not by those Swisher directors, but by Echolab to preserve the sale. So that's the no solicitation provision, the termination fee, and then they actually go around and lock up a certain number of votes, the directors and a certain number of insiders. And without the lockup of those votes, the deal would not have even passed. There would not have been enough public shareholder support to approve this transaction. So we allege that this was a deal that was done at any cost. And it was done at any cost because directors wanted to end the government investigations. There was an SEC investigation that was ongoing. There was a Department of Justice investigation that was ongoing. That was number one. They wanted to end that. And the directors themselves admitted in an SEC filing that they could be facing potential liability as a result of the investigations and the misrepresentations in the financial statements. Can you help me here with where do you draw the line between I'm entering into a transaction and I want it to be good for me, so I don't want you to be shopping it to other people, and I want you to tell me that you're going to vote for it, and I want you to do all of these things, and I want it for $40 million because this is all good for me. Where do you draw the line between that and the aiding and abetting? Right. Between hard bargaining and aiding and abetting. Yeah, taking advantage of the factual situations in a transaction. I mean, you know, it's a question of both. All these transactions, all these meetings, all these conversations, all non-public, they're all in private, there's been no discovery. This is just a pleading. We're just pleading this. You know, what you have to ultimately show to defeat a motion for summary judgment for our trial is not before the court. We are alleging on its face the transaction doesn't pass the smell test. It's $88 million worth of assets. Bear in mind, this was two or three months before they agreed to the sale. Two or three months before they agreed to the sale, they filed a document with the SEC saying these assets are worth $88 million. Two or three months later, they turn around and say, we're selling it for $40 million and we're putting in all these other terms so no one else can top it. And then coincidentally, they settled government investigations using the money from the sale, which is exactly what we alleged, that this was motivated, at least in part, if not altogether, to end this government investigation, for which they could potentially face personal liabilities, not unheard of at all. For the SEC to go out and impose fines on directors, to bar directors from serving as directors of public companies in the future, clawing back compensation. In hindsight, the Deferred Prosecution Agreement, which is not part of any of the pleading, totally extraneous to everything, government ultimately chooses just to name the company and to enter into a Deferred Prosecution Agreement. But that's all after the fact. We don't know what led up to that. And I may not have artfully asked the question because your point is well taken. This is a 2615 that was granted. And I mean, we're only dealing with allegations. What were the allegations, though, that took it from hard bargaining to and because what you're focusing a lot of what you're saying is why the defendants would enter into a, quote unquote, bad transaction. But this is a case against Ecolab. Aiding and abetting by Ecolab. So what were the allegations of what they did that crossed the line into aiding and abetting as opposed to just hard bargaining? These terms collectively amount to, as Judge Myerson held, a breach of fiduciary duty. And under Delaware law, they can drive a hard bargain up to the point that they are aiding and abetting a breach of fiduciary duty. And the allegation is that Ecolab was aware of the director's motives and exploited those motives. I mean, that's the allegation. It's forbidden the allegation, exploited it. And how do we know that? Because we look at the result and see. This is more than hard bargaining. I mean, this, I mean, the argument is, I mean, she held. If the allegations establish a breach of fiduciary duty, that you fail to maximize your duty to get the best price for your shareholders and you breach your fiduciary duty in doing that, you have the breach. I mean, this conduct has resulted in a breach, in these damages. And, yes, they can drive a hard bargain up to the point where it amounts to a breach of fiduciary duty by the other side. And that's our allegation. Would a fact finder or jury ultimately agree with that? Maybe, maybe not. It depends on what the evidence would show. But we're not at that point. This is whether or not we would have the right to attempt to prove that. That's all we're here for. And it becomes confusing because in all of these cases, you know, they inundate the court with hundreds of pages of extraneous factual material, well beyond the allegations of a complaint, in an attempt to basically try the case on the paper, which is exactly what they've done here. Look at all our documents. Look at all of this. It's all innocent. You know, that's ultimately a question of fact for the finder of fact. That's not something to be decided on a pleading. So... But doesn't the 80-day claim require ECOLAB to have some sort of fiduciary relationship with the fiduciary board's directors? You know, you just, you know, my wife keeps saying it's time for a hearing aid, and I think she's right. It requires them to have a fiduciary relationship with the fiduciary board's directors. No, I mean, does ECOLAB have to have a fiduciary relationship? No, absolutely not. I mean, that does, as a matter of law, ECOLAB does not have to have a fiduciary relationship with anyone. By definition, this is a third-party claim, an aiding and abetting claim. The fiduciary relationship has to be between the directors and the shareholders, which also is a fact. What evidence is there, then, that this was not an arm's-length transaction? I'm sorry, Your Honor? What evidence is there that this was not an arm's-length transaction? Okay, I, you know, it's the evidence that it's, you're selling $88 million worth of assets for $40 million. That's beyond hard bargaining. I mean, that's a breach of fiduciary duty. I mean, they have a duty to maximize value for shareholders. When they do something like that, that's, on its face, that's a breach of fiduciary duty. And then they agree to these other terms, which individually may be okay or may be okay in some cases or in other cases, but not when taken collectively in the context of this, where there's a sale, you know, a sale of $88 million for $40 million. And then they go out of their way to make sure that no one else can come in and top this offer. You can't solicit another bidder. And this is all what Ecolab is insisting on. We want these provisions. I mean, a seller would never insist on these provisions. These are all Ecolab provisions. Termination fee, that makes it more expensive for someone else to come in and buy the assets. And then they actually went around and locked up the vote. If I just may turn to the fraudulent transfer argument just briefly. So this is an issue we believe is a first impression in Illinois. And the issue is, you know, is a shareholder a creditor for purposes of a fraudulent transfer act? So that's an issue of statutory construction, at least in the first instance. And, you know, here the statute says, states literally, a creditor is a person with a, quote, claim. And it doesn't say a person except shareholders. Is count two, though, a derivative claim? Or is it a claim by the shareholders? So that's the second part, the second part of it. And, you know, as I say, it's a case of first impression. There's not a lot of authority out there. There's no authority in Illinois. The authority that's out there, principally California and some other states, have characterized this as a derivative claim. For better or for worse, that's the way they characterized it. So when we pleaded it, and we considered this. When we pleaded it, we thought, you know, maybe it could be direct, maybe it could be derivative. But the only authority out there says it's derivative. And so we pleaded it as a derivative claim. And if you look at Delaware law, they do look at something like this as a derivative claim. It's something that indirectly affects the shareholders. There was a fraudulent transfer of assets from the company. The company didn't get what it should have received as compensation for a claim. So, therefore, the shareholders are injured indirectly. And the company is the one that's injured directly. And in those circumstances, the Delaware courts have held that's a derivative claim. And, as I say, the only authority. But can the transferor bring the claim for fraudulent transfer? Well, yeah, the transferor here is not bringing the claim. But it's being brought on behalf of a creditor. And you're right, it's being brought derivatively. And, you know, that's the troubling part. But all of the authorities out there have held that you have to do that, that it has to be brought as a derivative claim. And I'll tell you, I have no doubt if we had brought this as a direct claim, that the defendants there would be arguing under Delaware law and under this California law, this should have been brought as a derivative claim. You know, you pay your money and you take your choice. We thought the authority was that it was a derivative claim, and that's the way we pleaded it. As I said, it's a case of first impression in Illinois. And so if the court ultimately concludes that it should be pleaded as a direct claim, we would request leave to do that because there is no authority on it. And we reasoned the way we thought was proper and that it was a derivative claim. And I believe it's a derivative claim. But should this court – And those claims in other jurisdictions, those were pursuant to the Uniform Fraudulent Transfer Act, those derivative claims that you're referring to, where the – because in essence what you have is you have the transport bringing the claim of a fraudulent transfer. Well, you know, I don't think the issues were that – well – And that's the difficult part. We just were not persistent with that. Well, it's fraudulent. I mean, I would agree. I mean, I would agree that you would think that the transfer would not be able to bring a fraudulent conveyance claim in its own right. So you're conceding that? I'm not conceding that. But I do agree that, you know, it's a better argument. The point is that all of the authority out there goes the other way. It's the only – it's really our only point. And – Well, fundamentally, a fraudulent transfer act transaction is brought by a claimant or a creditor saying the transaction is fraudulent. Right? So it's never brought on behalf of the transferor, ever.  It's always brought by somebody who claims – Well, you know, that's absolutely right. It is always brought on behalf of a creditor, and we are a creditor. And really, it's an issue of what do you do with the proceeds when you avoid the transaction. And, you know, the proceeds are going to go to the corporation. In the first instance, we're avoiding – attempting to avoid the entire $40 million transaction, which this client will get a very small piece of, or only a piece of it, which is why we believe it's the – Are you seeking to rescind the transaction, or are you seeking damages as a result of not getting a fair price? On the fraudulent transfer? Yes. Kind of? Yes. The way I read your complaint – Yeah. Was that you were seeking damages for – Right. – not getting the $40 – Right. – 80 million advance with the court. Right. And, you know, I mean, certainly the statute permits – the statute permits both. It permits the avoidance of the transaction. It would also permit the recovery of damages. I guess, you know, down the road, it would depend on whether it was practical or not to actually avoid the transaction. Thank you, Your Honor. Thank you. Ms. Jacobson? You can see we're very strict on our timelines. I can tell. May it please the Court. Jenny Jacobson on behalf of the Swisher Defendants. This case has nothing to do with Illinois. Mr. Berger challenges the transaction between two Delaware corporations, one's located in Minnesota, one's located in North Carolina. There's no allegation that this involves an Illinois company. Why did it need to close in Illinois? What? Why did it need to close in Illinois? Well, it wasn't the choice of the Swisher Defendants. Ecolab's counsel actually happened to reside here in Illinois, and that's where the closing was held. But none of the individual defendants traveled to Illinois for the closing. It was a virtual closing. Only attorneys were there. Also, importantly, there are no allegations that Mr. Berger or any Swisher shareholder actually resides in Illinois. No allegation in the complaint. The conduct at issue here has also been addressed in two separate suits. This transaction was challenged by another shareholder in North Carolina, where Swisher is located, bringing claims of breach of fiduciary duty. The court dismissed under Delaware law noting that the deer protections were reasonable. Yeah, but we're dealing with a 615 here, right? Yes. And there was a 61983 raising this issue in this case, I believe, at some point. But that's not in front of us because that's not what's being appealed. So I'd rather focus on the 615. That's fine. That's fine. The underlying wrongdoing alleged in the complaint has also been addressed, and the shareholder losses from that have been subject to separate securities class actions. And the conduct, this is alleged in the complaint, the conduct at issue has been the subject of a government investigation against Swisher and former employees. But there's no allegation that the individual defendants were subject to a government investigation. There are no allegations. And Plainter comes up with this idea that their personal interest in this suit, that they somehow entered into this transaction in order to avoid liability for government action, makes no sense. I don't know how, if you are subject to a government investigation, which there's no allegations, factual allegations to say that they were, that merely selling assets would allow you to avoid liability or the investigation. That's not how government investigations work. So that is, that personal interest just falls flat. There's two separate complaints in this appeal. The original complaint, Judge Kennedy dismissed the individuals for lack of personal jurisdiction and dismissed the claims against Swisher. And notably, Plaintiff did not file a motion to strike with respect to the judicially noticed facts or exhibits in that complaint, so waived any arguments with respect to the original complaint. In the amended complaint, so with respect to the original complaint, any exhibits that were used in that complaint, the Plaintiff did not file a motion to strike any of those exhibits in the original complaint. So those arguments are waived with respect to the original complaint, where my clients, the Swisher individual defendants, and Swisher were named as defendants. In the amended complaint, Judge Myerson dismissed both claims, but noted in the aiding and abetting claim against Echolabs, that Berger had stated a claim for breach of fiduciary duty against the defendants, the individual defendants. Not only did Judge Myerson apply the incorrect standard, a rebel on duty instead of a breach of business judgment rule, none of the Swisher defendants had the opportunity to brief this issue, as they were not named as defendants in that complaint. The individual defendants were not named in that complaint. So the idea that somehow that is law of the case or should not be disturbed, it just cannot stand. And how would we disturb that? I mean, what difference does it make? They're not named defendants in the second amended or the verified amended complaint. That's your point. I guess my point is that in the... You mean that the second complaint was only against Echolabs? In the briefing, the... No, not in the briefing, in the complaint.  In the complaint, it's only against Echolabs. Berger versus Echolabs, seeking relief from Echolabs, correct? In the amended complaint, seeking relief against Echolabs, Swisher is named as an individual, as a nominal defendant. The Swisher individual defendants. Correct. And I believe that in the briefing, plaintiff has tried to make this argument that somehow the breach of fiduciary duty claim has been decided, and I'm just pointing out that that cannot be. Turning to personal jurisdiction. But getting back to your last point, because I'm just unclear on this. Count to the derivative claim. Is Swisher a defendant to that? Swisher is a nominal defendant only, meaning that that claim is brought derivatively on behalf of Swisher. And so Swisher, under the Illinois law, Delaware law, could only challenge whether the demand that was not made on them was futile, whether there was demand futility. They couldn't, as a nominal defendant, challenge the underlying, bring it to a B6, a 615 motion. Turning to personal jurisdiction. Plaintiffs try to claim that there's jurisdiction because of a breach of fiduciary duty or tort in Illinois. And the only basis is that the closing occurred at Echo Labs Counsel's office, which no individual defendant attended. And that this was somehow the last event to render the director's liable. Burgess cases all focus on defendant's acts and the foreseeable consequences of such acts, as it relates to Illinois, such as injury to Illinois residents. Individual defendants, they don't reside in Illinois. They didn't attend the closing or conducting negotiations in Illinois. And they're not alleged to have injured any shareholder who resides in Illinois. If you turn to the other basis to assert jurisdiction, 2209A7, plaintiff claims the cause of action arises out of a contract substantially connected to Illinois. They have to go through several steps to make this argument. But the basis is that the support agreements, which the individuals actually entered into, were somehow the basis of personal jurisdiction. But there's a fundamental flaw with this argument. The supplemental agreements, the support agreements, are not alleged in the original complaint at all. Under Heller Financial, the court has held plaintiff must allege facts in the complaint upon which to base jurisdiction over a non-resident under the long-arm statute. They have not done so. The support agreements cannot form that basis. The transaction itself was not substantially connected to Illinois. Burgess cases all focus on the continuing and ongoing nature of the relationship in Illinois, not a single closing of a transaction between non-Illinois companies that happened to be in Illinois that no defendant attended. The fiduciary shield doctrine, plaintiff tries to rebut that with a couple of arguments. First, they say that the fiduciary shield doctrine does not apply to discretionary acts. The cases he cites all focus on whether defendants had the discretion to direct conduct, activity, business to Illinois in order to benefit themselves personally. That's just not the case here. The closing occurred in Illinois. That wasn't to benefit the individual defendants. That wasn't to somehow direct activity towards Illinois residents. Those cases just don't hold water. And then finally, plaintiff argues that the fiduciary shield doctrine should not apply because these individuals had a personal interest. Those arguments, again, make no sense. The first I've already addressed is in order to avoid liability for a government investigation, you don't avoid liability for a government investigation by selling your assets. That's just impossible to avoid. The individual defendant's stock ownership was treated exactly the same as ever the shareholder. There's accelerated restricted stock units. Delaware law has held as a matter of law that that argument does not create a personal interest. And in fact, one court has called that argument frivolous. I'll turn just very briefly to the breach of fiduciary. Okay. Just a note on the breach of fiduciary duty claim that the standard is absolutely the business judgment rule, not a Revlon or an increased Titan standard. But we're talking about pleadings. Yes. We're not talking about the ultimate decision. Right. And on the pleadings, under Delaware law, the business judgment rule. I thought in your brief you argued that the pleading standard is Illinois law. The substantive law of Delaware applies on. Substantive law versus the pleading requirements of Illinois. Right. I thought you argued in your brief that the pleading standards have to comply with Illinois requirements, not Delaware. I actually think that that's what plaintiff Mr. Berger argued. Do you not agree with that? Well, the standard of breach of fiduciary duty claim is governed by the business judgment rule. And the business judgment rule, Illinois courts have found the state of incorporation, which is here in Delaware, the substantive law applies at the pleading stage. And what happens is that the business judgment rule provides a presumption that the director has acted in good faith. And in order to survive a motion to dismiss, the actual plaintiff has to allege facts that show that those defendants didn't, that somehow revokes that presumption of good faith. That is the pleading standard that is employed on a 2615 motion with reference to Delaware law as the underlying state of incorporation. The only other thing that I would just mention is on the motion to strike. Plaintiff's arguments, really the motion to strike is about very undisputed facts that are a matter of public record that the court can take judicial notice of. And plaintiff's arguments really amount to that the information is irrelevant. Thank you. Thank you. Thank you. If your indulgence would be for myself. Great. So, Matthew Kipp on behalf of Ecolab Incorporated. Judge Myerson got it right when she held under 2615 that plaintiff had not pled sufficient facts to support a claim for aiding and abetting a breach of fiduciary duty by Ecolab in aiding and abetting the Swisher Board. Now, to set the stage, if you'll indulge me, I'd like to refer to a couple of – While we indulge you, we'll be reading into your time, so – Indulge away. Otherwise, I'll eat away. I think you can appreciate we've – I got it. We're pretty familiar with what the issues are. Right. So, facts. I'll give you all the words you need for ten minutes. It's a very portentous statement, but anyway. Facts. Number one, Swisher had incurred losses for each year from 2010 to 2015. And these aren't rounding error losses. These are multimillion dollar losses, right? Paragraphs 29 through 34. These losses range from anywhere from $15 million to $136 million in 2013. So then we have May 2015. Ecolab. Ecolab. Swisher's auditor issues a going concern letter, right? We know that. August 12, 2015, the day that Swisher decides to transfer its assets to Ecolab in return for $40 million. According to Plaintiff, before that day, Swisher is insolvent. We know that. We also know, paragraph 72, Swisher retains Castle Saltpeter as an investment banker to assess the fairness of the transaction on a financial point of view. Castle Saltpeter opines that this price is fair. Plaintiff doesn't sue Castle Saltpeter here. They're not part of this case. Lastly, October 15, 2015. This is paragraph 66. Swisher's shareholders approve the deal. Over 50%. Delaware law. Majority rules. The Swisher shareholders vote for the deal. So, in the summer and fall of 2015, Swisher was in dire financial condition. Going concern letter, according to Plaintiff, it's insolvent. It gets $40 million for these assets. They don't list the balance sheet in the first amended complaint, but to take you back to accounting 101, you list your assets at book, right? Book value. So you may have paid $88 million for these assets, which under GAAP, generally accepted accounting principles, you have to list at book. Doesn't mean you're going to realize that on a sale. And then we cite Arrhenius' case for that. Book value and fair market value are two very different, distinct concepts. Nevertheless, that's condition of Swisher in August 2015. What's going on with Ecolab and the board? Well, you got to go back to 2012. Why? Because in March of 2012, Swisher issues a press release at the end of March saying, hey, we have discovered accounting irregularities and we are conducting an investigation. Two weeks later, it issues another press release saying, investors, do not rely on our financial statements from 2011. Go forward a year, February 2013. Swisher, in its 10-K, states, two federal agencies are now conducting an investigation. The Securities and Exchange Commission and the Department of Justice. The market knew about that from February 2013 onward. We now know that in 2014-2015, Swisher tries to sell itself. We know that from paragraph 72. We know that Ecolab shows up in January 2015. There are no allegations, none, that Ecolab in any ways tries to interfere with Swisher's attempt to sell itself. Next, we know that from March 2015 to May 2015, and this is the big part, there are seven isolated conversations between Ecolab on the one hand and Richard Hadley on the other involving, this is a direct quote, the status of the SEC and DOJ investigations. That's it. No other board members are involved. The SEC is not involved. The Department of Justice isn't involved. These are separate conversations in the course of Ecolab's due diligence. Of course Ecolab is going to conduct due diligence on it. It's negotiating to buy the remaining assets of this company. That is a very logical thing to ask about and we cite case law to that effect. Now, the biggie, throughout the complaint, plaintiff alleges that these directors were personally motivated to sell, to get cash, to walk over to our friends in Washington, D.C. at the SEC and DOJ and sell. I'm going to read you a representative paragraph, and I know I'm cutting into my ten minutes, but I'll be quick. It's paragraph 79D, although variants show up throughout the complaint, and it says the Swisher directors reached their duties by, and now this is a quote, agreeing to the asset transfer to personally benefit themselves in ending the investigations by the SEC and the U.S. Attorney's Office of financial misstatements by Swisher and to eliminate any personal liability for the conduct under investigation. So in other words, the directors asked Swisher wanted this money so they could walk it over to the government officials and pay them to get them to drop the investigation. That is an outrageous allegation. Think about it. They were alleging that federal officials who took the same oath that you did to uphold their duties, that they would drop otherwise valid claims in return for cash. How does that fit in, outrageousness, fit in with 615? Because under 615, the question, Your Honor, is what's alleged, and then by implication, what's not alleged? And so the first question is, has there been a sufficient allegation of a fiduciary breach? Respectfully, we say no. To go back, Justice Walker, to your question then. Okay, whether there is or there isn't, and this is where I'm going next under 615, are there sufficient facts that says Ecolab aided and abetted that fiduciary breach? Point one, there aren't sufficient allegations under 615 that any breach ever occurred, and that's my outrageous comment, Justice Griffin. Point two, certainly under 615, there aren't sufficient allegations to show that Ecolab aided and abetted. What would we need to see? Well, let's turn to Zim. Let's turn to Gilbert. We've had to see active discussions with the SEC, active discussions with the DOJ, active discussions with the full board, side deals with the full board, none of it, skedad, nothing. At the moment of discovery in this case, we know there aren't enough. Well, good point. It's not alleged. And then the question is, could it have been alleged? Bad answer is yes. Why? Because by October 7, 2015, the government had put out a deferred prosecution agreement. They had put out the criminal information. They had settled with the SEC. Isn't the allegations that that was done in furtherance of this transaction? The allegation is they reached an agreement with the government and the government agreed to drop charges. But didn't Ecolab ask for that? Ecolab said it wouldn't do the deal unless these investigations came to a close. So that's a deferred advantage. The Ecolab's advantage? Don't step back. Yes. Yes. So that's a deferred advantage. And they're working with the directors of Swisher. That's an allegation that can reasonably be inferred to indicate, aiding and abetting these breaches of fiduciary duties that are undertaken for the benefit of the directors and not for the benefit of the corporation. It's a pleading. It's not the trial. It's not the final answer. It may not ever develop. But it's a plead. It's a plead. I go back to a point you made, a good one. We're proceeding here under Knox College v. Solitax where this is a fact-pleading state, right? So we're under the pleading standards of Illinois on the procedural side, and then we're on the substantive side in Delaware, right? And so for aiding and abetting, I refer you to cases like Matt Peete v. Townsend, Morgan v. Cash, BJ's Wholesale, Inresaba Software. Under those standards, you need more than the allegation set forth in the first amendment complaint to plead a claim for aiding and abetting against an acquirer. Why? Because it's what Justice Walker pointed out. At some point, Ecolab Public Company is duty-bound to get the best deal it can. What's the prescription on that? The prescription is that it can't do something that it knows would put the directors in a position of a fiduciary breach. But as now Chief Justice Sline of the Delaware Supreme Court puts in Morgan v. Cash, and it's repeated in Converge and other cases, at the same time Ecolab is duty-bound to negotiate as hard as it can to get the best deal as it can because its board members and its management are answerable to its shareholders to make sure that it safeguards its assets as best as they can. I'll make my last point on Comp 2 and I'll sit down and thank you for listening to me. Comp 2, it's a derivative claim, right? We can all agree. This is plain and straight. Well, I don't know how much I can agree because it has derivative claim at the top. But it says, paragraph 89, plaintiff was a creditor of Swisher as a shareholder with liquidation and other rights when Swisher directors agreed to the asset transfer at the time of the asset transfer and subsequent to it. Yeah. Paragraph 90, pursuant to the Fraudulent Transfer Act, transfers fraudulent as to plaintiff and Swisher. Yes. 91, pursuant to the Fraudulent Transfer Act, the asset transfer may be avoided to the extent necessary to make plaintiff and Swisher whole. It seems to me that this is a combined count for a derivative claim and a personal claim by the plaintiff. I mean, I'm just looking at the and aware for plaintiff respectfully request. So anyway, I'm not going to say we can all agree that it's a derivative. Certainly. If that's the case, then we ecolab have been a little sandbag because that's certainly how it was. We were a little sandbag because we were we it was put as a derivative below. That's what we argued below in the briefs. That's what we argued before you. If it were direct, we'd respond to that as well. And as you can imagine, we'd have arguments for that as well. Why the director doesn't stand. Why? Because Illinois law is clear under the Fraudulent Transfer Act. You have to be a creditor with an existing claim. Claimant. Creditor is defined as a claimant with a claim at the time of the transfer. There's not a single case in Illinois. I'll promise you that says a shareholder is a claimant prior to a deal. Trust me, you won't find it. Well, counsel, I trust that you would know the rules of the appellate court as far as the length of briefs, which was violated in this case. You're entitled to 50 pages, not 59. You're entitled to 15,000 words, not 17,290. I believe you're entitled to 15,000 words, not 17,290.   You're entitled to 15,000 words, not 17,290. Judge, mine was 35. I will go ahead. All right. Thank you. Very well. Thank you. Mr. Keating. Your Honor, just two quick points. First of all, I want to just kind of start off where we just left off. What conduct on the part of Ecolab or Ecolab is alleged in this complaint, in your First Amendment complaint? What conduct? There's no conduct alleged. You simply state that they're charged with knowledge of Swisher's director's fiduciary duty to its shareholders. Then you don't speak with them at all in paragraph 79, A through E. And then you, again, in paragraph 80, you say Ecolab knowingly participated, assisted in, and benefited from Swisher's director's breach of fiduciary duty. Not alleging any conduct on the part of Ecolab.  So if you're leading in a betting or something, you could substitute Carl Walker for Ecolab here. I mean, the allegations, I think, are paragraph 79, 80, 81. I just read paragraph 79, and I read paragraph 80. That's what I just read out loud. Nothing's being alleged. No conduct. Sure. Again, you can assert Carl Walker in here and have a complaint against me. It's the deal and the results of the deal. The conduct that's alleged is that, as I've said. If I'm aiding in a betting, I'm doing something. It's more than just my knowing. Right. There's always a fiduciary duty to the shareholders. Right. There isn't a fiduciary duty to their clients. But if I have no conduct whereby I'm aiding a lawyer in doing something wrong or I'm aiding directors of a corporation in doing something wrong, there's got to be some conduct alleged in your complaint. Right. That's where the problem is. So I'm asking you to point to me where is the conduct alleged and what conduct. The conduct is that Ecolab forced this deal on the Swisher directors, with knowledge that the Swisher directors were motivated to do a deal at any price because in breach of their fiduciary duty for their own personal interests, because they wanted to avoid liability for the investigations. They wanted the accelerated stock. You know, I mean, bear in mind, you know, invested stock is worthless until it vests, completely worthless. And if it doesn't vest at all, it's worthless. So there's a monetary incentive. They needed a triggering event to do that. This was the triggering event. So rather than saying someone drove the bus, you're saying that the overall transaction is agreed to and formulated by ECO, aided and abetted the directors from getting out from under some potential personal liability, that they structured this deal in such a fashion that it would, quote, have a fire sale of assets, allow for the directors to avoid some potential criminal penalties. Or civil liability. Civil liability or whatever. So I'm saying that it was the transaction itself, not any particular telephone call or email. Right. I mean, I think discovery may well show that. But certainly that's the allegation at this point. You know, what the court has heard is a closing argument. The court is on a 2-615 motion. The allegations are accepted as true. What you've heard is all the reasons why you should not believe the allegations, why the allegations can be rebutted. It's just not the standard. The shareholder vote. I mean, that's another point. I mean, it's totally irrelevant. I mean, there's a case in Delaware, Royal Metro. The deal was approved by 80% of the shareholders, overwhelmingly. The court found that the buyer aided and abetted a breach of fiduciary duty and awarded $72 million in damages against the aider and abetter. So what? The shareholder vote has nothing to do with it. These are all arguments that are attempting to prejudice the court on the merits of a claim rather than look at the complaint and see whether or not we get to the next base. And there's more than that up here. I mean, it's a detailed complaint. Do you have anything else you'd like to add? Thank you, Your Honor. Okay. All right. Thank you all for your efforts in this matter. Stacey, we will take the matter under advisement before it stands in recess.